**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PATRICIA JONES | ) | |
| | ) | |
| Plaintiff, | ) | Judge Wayne Andersen |
| | ) | |
| vs. | ) | 08 C 1521 |
| | ) | |
| PRIME INVESTMENT MORTGAGE | ) | Magistrate Ashman |
| CORPORATION; OPTION ONE | ) | |
| MORTGAGE CORPORATION; and | ) | |
| DOES 1-5, | ) | |
| | ) | **JURY DEMAND** |
| Defendants. | ) | |

**PLAINTIFF'S UNOPPOSED MOTION FOR LEAVE
TO FILE SECOND AMENDED COMPLAINT, *INSTANTER***

Plaintiff respectfully requests an Order from the Court granting her leave to file a seconded amended complaint, a copy of which is attached hereto as Appendix A, and to deem it filed *instanter*. This motion is unopposed. In support of her motion, plaintiff states as follows:

1.      This action was filed March 13, 2008. After all parties were served and one responsive pleading was filed, plaintiff filed her first amended complaint on June 13, 2008.

2.      The reason for a seconded complaint so soon thereafter is as follows. On June 13, 2008, plaintiff requested in writing from the loan's servicer, defendant Option One, the identity of the current assignee of ownership of plaintiff's loan. Option One provided that information on July 1, 2008.

3.      The assignee of ownership is a necessary party to a Truth In Lending Act ("TILA") rescission claim (Count I) because TILA provides for unconditional rescission as to the assignee, even where the assignee had nothing to do with the origination of loan. 15 U.S.C. 1641(c)(right to rescind may be exercised against "any assignee").

1

4.      On July 10 and 11, 2008, Plaintiff's counsel consulted with counsel for defendants Option One and Prime Investment.  Both stated that they have no opposition to plaintiff filing a second amended complaint for the purpose of adding the current assignee of the loan.

5.      Plaintiff's counsel has made no other additions, subtractions or changes to the proposed second amended complaint attached in Appendix A.

6.      Fed.R.Civ.P. 15(a) provides that "leave [to file an amended complaint] shall be freely given when justice so requires."  A district court should only deny a motion to amend a complaint if there is a substantial reason to do so.  Espey v. Wainwright, 734 F.2d 748, 750 (11th Cir. 1984)  ("Unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial"); Dussouy v. Gulf Coast Investment Corp., 660 F.2d 748, 597 (5th Cir. 1981).

7.      At this beginning stage of litigation, the minor, proposed changes would not cause any prejudice to the defendants.  See Johnson v. Oroweat Foods, 785 F.2d 503, 510 (4th Cir. 1986) (court held that the addition of new factual allegations or a change in legal theory only prejudices the defendant if the amendment is sought shortly before or during trial);  Hely & Patterson Intern v. F.D. Rich Housing, 663 F.2d 419, 426 (3d Cir. 1981) ("In the context of a 15(a) amendment, prejudice means that the nonmoving party must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the amendments . . . been timely"); Head v. Timken Roller Bearing Co., 486 F.2d 870, 873 (6th Cir. 1973) ("amendments should be tendered no later than the time of pretrial . . .").

WHEREFORE, plaintiff respectfully requests that the Court enter an Order:  (1)

2

granting her leave to file the proposed Second Amended Complaint, a copy of which is attached

as <u>Appendix A</u>: (2) deeming the Second Amended Complaint filed <u>instanter</u>; and (3) granting

any further or other relief that the Court deems just.

Respectfully submitted,

<u>s/Al Hofeld, Jr.</u><br>Al Hofeld, Jr.

Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
and The Social Justice Project,
208 S. LaSalle Street, Suite #1650
Chicago, Illinois  60604
Phone - (312) 345-1004
Fax - (312) 346-3242
al@alhofeldlaw.com

# APPENDIX A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PATRICIA JONES | ) | |
| | ) | |
| Plaintiff, | ) | Judge Wayne Andersen |
| | ) | |
| vs. | ) | 08 C 1521 |
| | ) | |
| PRIME INVESTMENT MORTGAGE | ) | Magistrate Ashman |
| CORPORATION; OPTION ONE | ) | |
| MORTGAGE CORPORATION; WELLS | ) | |
| FARGO BANK, N.A., as Trustee for the | ) | |
| benefit of the certificate holders of asset- | ) | |
| backed securities corporation home equity | ) | |
| loan trust, series OOMC 2005-HE6; and | ) | |
| DOES 1-5, | ) | |
| | ) | **JURY DEMAND** |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

### INTRODUCTION

1.      Plaintiff brings this action against a "subprime" mortgage lender and its

assignee to secure redress for predatory lending practices in violation of the Illinois Consumer

Fraud Act ("ICFA"), 815 ILCS Sect. 505/2, the Fair Housing Act ("FHA"), the Equal Credit

Opportunity Act ("ECOA"), the Truth in Lending Act ("TILA") and TILA's implementing

regulations.

### JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331

(general federal question), 1337 (interstate commerce), 1367 (supplemental jurisdiction), 42

U.S.C. § 3613 and § 3717 (FHA), 15 U.S.C. §1691e (ECOA), and 15 U.S.C. §1640 (TILA).

3.      Defendants transact business in the District and are deemed to reside here.

1

## PARTIES

4.      Mark Smith and Patricia Jones, husband and wife, own and reside in a
home at 6357 S. Campbell, Chicago, Illinois 60629.  They have two children.  Ms. Jones runs a
small child care center.  She and her husband have a high school education.  They are ordinary
consumers.  They are African-American.

5.      Defendant Prime Investment Mortgage Corporation ("Prime Investment")
is an Illinois corporation with its principal offices at 2240 West Armitage Avenue, Chicago, IL,
60647.  It does business throughout the Chicago area.  It is engaged in the business of, inter alia,
originating sub-prime mortgage loans.

6.      Prime Investment originated more than 26 mortgage loans during 2005.

7.      Defendant Option One Mortgage Corporation ("Option One") is a
California Corporation, which does business in Illinois.  Its registered agent and office are CT
Corporation System, 208 S. LaSalle Street, Suite #814, Chicago, IL 60604.  Option One is
engaged in the business of purchasing and servicing sub-prime mortgage loans.  It presently
services plaintiff's loan.

8.      Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), as trustee, is a
federally-chartered corporation that is engaged in the business of purchasing and holding legal
title to sub-prime, residential mortgage loans.  It has principal offices at 7495 New Horizon Way,
Frederick, MD, 21703 or at 9062 Old Annapolis Road, MAC-N2702-011, Columbia, Maryland,
21045-1951.  It does business in Illinois.  On information and belief, Well Fargo currently owns
plaintiff's loan.  The loan is securitized in a trust, the full name of which is Wells Fargo Bank,

2

N.A., as trustee for the benefit of the certificate holders of asset-backed securities corporation

home equity loan trust, series OOMC 2005-HE6.

9.     If Wells Fargo does not own plaintiff's loan, the current actual owner(s)

is/are named as Does 1-5.  Ownership of such loans is not a matter of public record.  Request for

the identity of the owner was made to Option One, which identified Wells Fargo as the current

mortgagee.

**FACTS COMMON TO ALL COUNTS**

10.     On or about April 14, 2005, Laura Dantuma of Prime Investment solicited

Ms. Jones to refinance her mortgage.  She phoned plaintiff at home and offered "help" in the

form of "cash out" to pay past due real estate taxes and outstanding consumer debts.

11.     In that phone call, Ms. Dantuma took application information from

plaintiff over the phone and typed it into a computer to generate a completed loan application.

At all times, Ms. Dantuma and Prime Investment knew plaintiff was African-American.

12.     Prime Investment rushed plaintiff through the process.  Ms. Dantuma had

Ms. Jones meet her at her office on a Sunday, when no one else was there, in order to sign the

initial loan application and to provide proof of income.

13.     Prime Investment did not provide plaintiff with any preliminary

disclosures whatsoever, in violation of TILA, the Real Estate Settlement Procedures Act

("RESPA") and other federal law.

14.     The loan was closed just two weeks later, on or about April 28, 2005.  All

of the documents Prime Investment provided to plaintiff bear this date.

15.    The following are documents relating to the final loan: a mortgage (Exhibit A), a note (Exhibit B), a HUD-1 Settlement Statement (Exhibit C), a Truth In Lending Disclosure Statement (Exhibit D) and two federal Notice of Right To Cancel forms (Exhibit E).

16.    Prime Investment provided plaintiffs with two, Notice of Right to Cancel forms (Exhibit E), instead of the four required (i.e., two per mortgagor).

17.    Plaintiff and her husband held the property together, and Prime Investment had both sign the mortgage (Exhibit A).

18.    Prime Investment gave plaintiff a "2/28" adjustable interest rate loan with exorbitant closing fees, as detailed below.

19.    The 1-4 Family Rider to the Mortgage (Exhibit A) shows that Prime Investment took a security interest in not only the real estate and fixtures but in all of plaintiff's personal property inside the home. This interest was not disclosed on the TILA Disclosure Statement, as required by TILA.

20.    Ms. Jones and her husband used the loan for personal, family or household purposes, namely, refinancing of prior debts incurred for such purposes.

21.    Immediately following closing, servicing of plaintiff's loan was transferred to Option One (Exhibit F). As servicer, Option One claims certain rights in plaintiff's loan, including the right to receive payments, report to credit bureaus and to pursue foreclosure as a means of enforcing payment. It is, therefore, named as a necessary party.

22.    On information and belief, ownership of the loan was eventually assigned to defendant Wells Fargo Bank, N.A., as Trustee. In the event Wells Fargo does not currently own plaintiff's loan, the actual owner(s) is/are named as Does 1-5.

4

23.     Plaintiff was current on her mortgage until her adjustable interest rate began re-setting in May, 2007.  Her income has not changed since she initially applied for the loan.

24.     On or about September 24, 2007, when Ms. Jones phoned Option One to explain that she was having difficulty affording the payments, the customer service representative told her she could be considered for a loan modification.  She faxed the requested bank statements and hardship letter the same day.  She was told a decision would be made within 45 days.

25.     Six months later and after many phone calls from plaintiff, Option One still has not notified her of any decision on a loan modification.

26.     In the meantime, plaintiff has fallen several months behind on payments and lives in fear that Option One will initiate foreclosure.  Although Option One has repeatedly instructed plaintiff not to make payments until a decision on the loan modification has been made, it has nevertheless imposed late fees in excess of $1,710.54 (Exhibit G).

### Prime Investment's Fraud In the Inducement

27.     After Dantuma took plaintiff's application, Prime Investment arranged for Grace Appraisal Services ("Grace") to perform an appraisal of plaintiff's property.

28.     On information and belief, at the time Dantuma and or Prime Investment did a high volume of business with Grace.

29.     Grace was Dantuma's and/Prime Investment's agent(s) for purposes of performing an appraisal of plaintiff's home and property.

5

30.    On information and belief, Dantuma and/or Prime Investment conspired with Grace to arrange for a fraudulently inflated appraisal of the market value of plaintiff's property.

31.    On information and belief, on or about April 14, 2005, Dantuma contacted and advised Grace of the value she needed in order to support the principal amount of the loan she wished to make to plaintiff. The two agreed upon a minimum value or value range for the property.

32.    Grace obliged because it wanted to continue to receive the stream of business from Dantuma and Prime Investment. On information and belief, Grace did a high volume of its business with Prime Investment.

33.    On or before April 28, 2005, Grace appraised the home and property for, on information and belief, $265,000 (Exhibit H, which is the incomplete copy of plaintiff's loan application Prime Investment provided to her at closing). Plaintiff did not receive a copy of the appraisal.

34.    The $265,000 was substantially and artificially inflated.

35.    Five years earlier, in June, 2000, the home appraised for $158,000.

36.    A March 4, 2008 check on Zillow.com indicates that the property is currently worth approximately $202,500.

37.    Plaintiff resides in a neighborhood, Gage Park on the southwest side, in which home values did not rise or fall as dramatically as in other neighborhoods in Chicago.

38.    After Grace performed the appraisal, it communicated the inflated value to Dantuma and Prime Investment, which inserted the same onto the final loan application that they then had plaintiff sign at closing on April 28, 2005 (Exhibit H).

6

39.     Both before and after closing, Prime Investment knew that it was making a loan to plaintiff that was based on an artificially and fraudulently inflated appraised value.

40.     Dantuma and Prime Investment did this in order to earn greater amounts of percentage-based, broker fees and in order to generate greater interest income from the loan.

41.     As a result of its actions, plaintiff has zero or negative equity in her home, a fact which prevents her from refinancing out of Prime Investment's adjustable rate loan.

42.     Further, due to the adjustable rate, which continues to rise, plaintiff has become unable to make payments, the amount of which are increasingly out of her reach.  Prime Investment's actions trapped her in a loan that has put her family's home at risk of foreclosure.

### Prime Investment's Discrimination On Account of Race

43.     Exhibit C shows that, in addition to a $3,468.00 "origination fee" (line 801), Prime Investment Mortgage charged plaintiff an $850 "application fee" (line 809), an $800 "underwriting fee" (line 811), and a $200 "processing fee" (line 808).  The appraisal fee to Grace was $600 (line 803).

44.     On information and belief, Prime Investment, on average, gives higher interest rates to minority borrowers than to Caucasians, regardless of qualifications, as well as charges a higher closing fees (as a percentage of loan principal) in minorities' transactions than it does in whites'.  Plaintiff was overcharged in this manner.

45.     Prime Investment's pricing practices disproportionately impact minority borrowers such as plaintiff.  Plaintiff and other minorities are, on average, subject to higher interest rates and closing fees simply because of their race.

46.     This result is known and intended by Prime Investment.

7

47.    The result is very lucrative for Prime Investment. Loans with higher interest rates, and with higher closing fees that are financed, earn Prime Investment more profits, whether it holds the loans in portfolio or sells them to investors on the secondary market.

48.    On information and belief, Prime Investment's loan pricing policies delegate significant authority and discretion over interest-rate and closing fee pricing to individual loan officers such as Dantuma. This system gives and is intended to give such loan officers incentive to engage in the subjective mark-up of credit applicants' interest rates and closing fees, without regard to qualification or actual risk. Prime Investment permits any otherwise neutral underwriting criteria to be overridden in this manner. One of the subjective criteria that enter into the loan officers' equation is race.

49.    Prime Investment is well aware that its pricing policies influence its loan officer's sales behavior, including Dantuma's in plaintiff's transaction. This is the policy's intended effect.

50.    On information and belief, Dantuma and other loan officers are compensated in significant part on the basis of the interest rate and/or fees associated with the loans they originate or broker, which provides them with the incentive to increase minority borrowers' interest rates and closing costs.

51.    Prime Investment's brokers are, on average, more effective in persuading its African-American and Latino credit applicants to accept higher interest rates and closing fees than its white customers.

52.    In recent years, interest rate and closing fee disparities by race have been subjects of numerous credible studies and discussion, including in trade journals and other

8

industry publications. Defendants were on notice of the findings of these studies and related concerns but continued their lucrative practices anyway.

53.     Prime Investment discriminates in another manner. It also intentionally and disproportionately targets minorities for solicitation for high-cost subprime loans.

54.     Prime Investment disproportionately targets minority borrowers in its telemarketing and other product marketing activities in the Chicago area.

55.     There is no legitimate business reason justifying the discriminatory effect of plaintiff's and other minorities' assignment by defendant, regardless of qualification, of higher interest rates and closing fees, on average, than white borrowers.

56.     Alternative policies and practices exist that would not have the same disparate impact on minority borrowers.

57.     As a result of Prime Investment's conduct, plaintiff was induced to sign loan documents providing for a loan that was unnecessarily expensive and that was made on less favorable terms than loans defendants made to similarly-situated Caucasians.

58.     Plaintiff will prove her claims of discrimination, in part, through a statistical analysis of defendant's loan transactions, based on quantitative data obtained from defendant's loan files.

### Option One's Retaliation Against Plaintiff For Filing Suit

59.     This action was filed March 13, 2008. Option One was served March 18, 2008. Its counsel was retained prior to April 3, 2008.

60.     After suit was filed, Ms. Jones continued to phone Option One once or more each week to ask if a decision had been made regarding her application for a loan modification.

9

61.     More than once, she had been told that her application was tentatively approved but was nevertheless asked to call back.  On one occasion, since so much time had passed, Option One requested, and she provided, an additional three months' worth of bank statements.

62.     On other occasions, Ms. Jones was told that because her application for a loan modification was so likely to be approved, she should not send any further payments.

63.     She was also told that, as long as she was being considered for a loan modification and because such was likely, Option One would not initiate a foreclosure action.

64.     However, on April 4, 2008, when Ms. Jones called Option One, it informed her that her application for a loan modification had been denied.  Option One would not give her a reason.  Instead, she was told she would receive a letter through the mail that would explain the reasons for the denial.  To this day, she has received no letter and no explanation.

## COUNT I – TRUTH IN LENDING ACT – INDIVIDUAL CLAIM

65.     Plaintiff incorporates paragraphs 1-64.  This count is against Prime Investment and Wells Fargo.  Option One, as servicer, is named as a necessary party only.

## RIGHT TO RESCIND

66.     Because the transaction was secured by plaintiff's home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by 15 U.S.C. Sect. 1635 and 12 C.F.R. Sect. 226.23.  Sect. 226.23 provides:

**(a) Consumer's right to rescind.**

(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47

(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.

(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act.  [15 U.S.C. §1635(f)]

(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.

(b) <u>Notice of right to rescind.</u> In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

(1) The retention or acquisition of a security interest in the consumer's principal dwelling.

(2) The consumer's right to rescind the transaction.

(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(4) The effects of rescission, as described in paragraph (d) of this section.

(5) The date the rescission period expires. . . .

**(f) Exempt transactions.** The right to rescind does not apply to the following:

**(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].**

**(2) A credit plan in which a state agency is a creditor.**

## GROUNDS FOR RESCISSION

67.    In connection with the loan, Prime Investment failed to provide plaintiff with proper notice of her federal right to cancel the transaction. It provided plaintiff with only one federal Notice of Right to Cancel form – or with a total of two for both mortgagors – in violation of 12 C.F.R. Sect. 226.23(b) above.

68.    This complaint serves as legally sufficient notice of plaintiff's intent to exercise her right to rescind the loan.

69.    The loan has not been rescinded.

70.    Under 15 U.S.C. Sect. 1641(c), the right to rescind may be exercised against "any assignee," including Wells Fargo.

71.    In addition, 15 U.S.C. Sect. 1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for:

a.    A judgment voiding plaintiff's mortgage, capable of recordation in the public records, and binding on defendants;

12

     b.     Statutory damages for the underlying violation;

     c.     If appropriate, statutory damages for failure to rescind;

     d.     Attorney's fees, litigation expenses and costs; and

     e.     Such other or further relief as the Court deems appropriate.

## COUNT II - ILLINOIS CONSUMER FRAUD ACT

71.     Plaintiff incorporates paragraphs 1-64.

72.     This claim is against Prime Investment.

73.     Defendant engaged in unfair practices, in violation of §2 of the Illinois Consumer Fraud Act, 815 ILCS 505/2, by engaging in the unfair and/or deceptive conduct that resulted in originating a loan to plaintiff based on an inflated home value.

74.     In particular, defendant engaged in unfair and/or deceptive acts and practices, in violation of §2 of the Illinois Consumer Fraud Act, 815 ILCS 505/2 by, among other things:

     a.     Arranging for, conspiring or colluding with Grace Appraisal Services to produce a fraudulently inflated appraisal of plaintiff's home and disguising the fact that she was receiving high loan-to-value loan, all for the purpose of inducing plaintiff to take out the loan so that Prime Investment could reap the profits;

     b.     Misrepresenting to plaintiff the actual market value of her home and making a loan to her that it knew was based upon an inflated appraised value;

     c.     Knowingly falsifying the value of plaintiff's home plaintiff's on her loan application; and

     d.     Having plaintiff sign a loan application containing a false appraised value, thereby putting her at risk of prosecution;

13

75.    Defendant engaged in such conduct in the course of trade and commerce.

76.    Defendant engaged in such conduct with the intent that plaintiff rely on its

deception.

77.    Defendants engaged in such conduct with the intent to injure plaintiff.

78.    Plaintiff was damaged as a result.

79.    Defendants' conduct caused plaintiff's injuries.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of

plaintiff and against defendant for:

a.    Compensatory, punitive and other appropriate damages;

b.    Attorney's fees, litigation expenses and costs.

c.    Such other or further relief as the Court deems appropriate.

## COUNT III – COMMON LAW FRAUD IN THE INDUCEMENT

80.    Plaintiff incorporates paragraphs 1-64.

81.    This claim is against Prime Investment.

82.    Defendant arranged for and/or approved the fraudulent appraisal of

plaintiff's property and approved and originated a loan to plaintiff based on the artificially

inflated value.

83.    Defendant knew that the appraised value was inflated and false or was

reckless with respect to its truth or falsity.

84.    Defendant intended for plaintiff to rely on the fraudulent appraised value

in order to induce plaintiff to take out the loan.

85.    The value of plaintiff's property was a material term and predicate of the

transaction with defendant.

14

86.     Plaintiff did, in fact, rely on defendants' fraudulent misrepresentation. Plaintiff's reliance was justified.

87.     Plaintiff was injured thereby.

WHEREFORE, plaintiff requests that the Court enter judgment in her favor and against defendant for:

        a.     Actual, punitive and other appropriate damages;

        b.     Punitive damages; and

        c.     Such other relief as the Court deems appropriate.

## COUNT IV -- CIVIL CONSPIRACY TO COMMIT FRAUD

88.     Plaintiff incorporates paragraphs 1-64.

89.     This claim is against Prime Investment.

90.     Defendant combined and conspired with the Grace Appraisal Services to unlawfully arrange for and produce a fraudulent, appraised value for plaintiff's property.

91.     Defendant took concerted and overt actions in furtherance of this fraudulent purpose.  Prime Investment and Grace agreed upon a minimum value or range of value in advance of the appraisal being performed, and Prime Investment approved the loan knowing that the probable actual value of the home was well below $265,000.

92.     Defendant conspired - out of excessive concern for its fees, commission and profits - to misrepresent, conceal, overlook and suppress the actual market value of plaintiff's property.

93.     Plaintiff was damaged as a result.

WHEREFORE, plaintiff requests that the Court enter judgment against defendant for:

15

    a.     Compensatory, punitive and other appropriate damages;

    b.     Costs; and

    c.     Such other or further relief as this Court deems appropriate.

## COUNT V – FAIR HOUSING ACT - CLASS CLAIM

94.    Plaintiff incorporates paragraphs 1-64.  This claim is against Prime

Investment.

95.    The Fair Housing Act, 42 U.S.C. §3605, provides:

**Discrimination in residential real estate-related transactions**

**(a) In general. It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.**

**(b) "Residential real estate-related transaction" defined. As used in this section, the term "residential real estate-related transaction" means any of the following:**

    **(1) The making or purchasing of loans or providing other financial assistance--**

        **(A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or**

        **(B) secured by residential real estate.**

    **(2) The selling, brokering, or appraising of residential real property.**

**(c) Appraisal exemption. Nothing in this title prohibits a person engaged in the business of furnishing appraisals of real property to take into consideration factors other than race, color, religion, national origin, sex, handicap, or familial status.**

96.    Defendant Prime Investment violated the Fair Housing Act by assigning

plaintiff and other minorities higher interest rates, on average, than it assigned Caucasian

customers and/or by charging higher broker fees (as a percentage of loan principal), on average, to plaintiff and other minority customers.

97.    The Fair Housing Act, 42 U.S.C. §3613, provides:

**§ 3613.  Enforcement by private persons**

**(a) Civil action.**

**(1) (A) An aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice, or the breach of a conciliation agreement entered into under this title, whichever occurs last, to obtain appropriate relief with respect to such discriminatory housing practice or breach. . . .**

**(c) Relief which may be granted.**

**(1) In a civil action under subsection (a), if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages, and subject to subsection (d), may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).**

**(2) In a civil action under subsection (a), the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee and costs. The United States shall be liable for such fees and costs to the same extent as a private person. . . .**

## CLASS ALLEGATIONS

98.    Plaintiff brings this claim on behalf of a class consisting of (a) all African-American persons with Illinois addresses, (b) who obtained a mortgage loan directly from Prime Investment, (c) paid closing fees to Prime Investment and (d) where the loan was closed on or after a date two years prior to the filing of this action.

99.    The class is so numerous that joinder is impracticable.  On information

17

and belief, there are more than 50 members of each class.

100.    There are questions of law and fact common to the members of each class, which common questions predominate over any questions that affect only individual class members. The predominant common question is whether African-Americans, on average, were assigned higher interest rates and paid a greater percentage of closing fees than Prime Investment's Caucasian customers.

101.    Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

102.    Plaintiff will fairly and adequately represent the interests of the class members. Plaintiff has retained counsel experienced in mortgage cases and class actions.

103.    A class action is superior to other, alternative methods of adjudicating this dispute.    Individual cases are not economically feasible.    The nature of the claim is such that proof of the class-wide disparate impact of imposing higher interest rates and charging higher closing fees is necessary.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and the class and against defendant for:

a.    Declaratory relief;

b.    Injunctive relief;

c.    Appropriate damages;

d.    Attorney's fees, litigation expenses and costs; and

e.    Such other or further relief as the Court deems appropriate.

## COUNT VI – EQUAL CREDIT OPPORTUNITY ACT - CLASS CLAIM

104.    Plaintiffs incorporate paragraphs 1-64.    This claim is against Prime

18

Investment.

105.    The Equal Credit Opportunity Act, 15 U.S.C. §1691, provides:

**(a) Activities constituting discrimination.  It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction--**

**(1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract) . . .**
.

106.    Defendant violated the ECOA in the manner alleged above.

107.    The Equal Credit Opportunity Act, 15 U.S.C. §1691e, further provides:

**Civil liability**

**(a) Individual or class action for actual damages.  Any creditor who fails to comply with any requirement imposed under this title shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting either in an individual capacity or as a member of a class.**

**(b) Recovery of punitive damages in individual and class action for actual damages; exemptions; maximum amount of punitive damages in individual actions; limitation on total recovery in class actions; factors determining amount of award.  Any creditor, other than a government or governmental subdivision or agency, who fails to comply with any requirement imposed under this title shall be liable to the aggrieved applicant for punitive damages in an amount not greater than $ 10,000, in addition to any actual damages provided in subsection (a), except that in the case of a class action the total recovery under this subsection shall not exceed the lesser of $ 500,000 or 1 per centum of the net worth of the creditor. In determining the amount of such damages in any action, the court shall consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional.**

**(c) Action for equitable and declaratory relief.  Upon application by an aggrieved applicant, the appropriate United States district court or any other court of competent jurisdiction may grant such equitable and declaratory relief as is necessary to enforce the requirements imposed under this title.**

19

(d) Recovery of costs and attorney fees.  In the case of any successful action under subsection (a), (b), or (c), the costs of the action, together with a reasonable attorney's fee as determined by the court, shall be added to any damages awarded by the court under such subsection. . . .

(f) Jurisdiction of courts; time for maintenance of action; exceptions.  Any action under this section may be brought in the appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction. No such action shall be brought later than two years from the date of the occurrence of the violation . . . .

## CLASS ALLEGATIONS

108.    Plaintiff brings this claim on behalf of a class consisting of (a) all African American persons with Illinois addresses, (b) who obtained a mortgage loan directly from Prime Investment, (c) paid closing fees to Prime Investment and (d) where the loan was closed on or after a date two years prior to the filing of this action.

109.    The class is so numerous that joinder is impracticable.  On information and belief, there are more than 50 members of each class.

110.    There are questions of law and fact common to the members of each class, which common questions predominate over any questions that affect only individual class members.  The predominant common question is whether African-Americans, on average, were assigned higher interest rates and paid a greater percentage in closing fees than Prime Investment's Caucasian customers.

110.    Plaintiff's claim is typical of the claims of the class members.  All are based on the same factual and legal theories.

111.    Plaintiff will fairly and adequately represent the interests of the class members. Plaintiff has retained counsel experienced in consumer credit cases.

112.    A class action is superior to other alternative methods of adjudicating this

20

dispute. Individual cases are not economically feasible. The nature of the claim is such that proof of the class-wide impact assigning higher rates and charging higher fees is necessary.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and the class and against defendants for:

    a.    Declaratory relief;

    b.    Injunctive relief;

    c.    Appropriate damages;

    d.    Attorney's fees, litigation expenses and costs; and

    e.    Such other or further relief as the Court deems appropriate.

## COUNT VII – EQUAL CREDIT OPPORTUNITY ACT – INDIVIDUAL CLAIM

113.    Plaintiff incorporates paragraph 1-64. This claim is against defendant Option One.

114.    Plaintiff was an "applicant" within the meaning of 15 U.S.C. §1691a(b) of the ECOA and implementing Regulation B (which defines "applicant" to include persons who have already *received* credit).

115.    By filing this lawsuit in good faith pursuant to the Consumer Credit Protection Act, plaintiff was and is engaged in a statutorily protected activity.

116.    However, as a direct consequence of filing this lawsuit, plaintiff has suffered and continues to suffer adverse action at the hands of defendants. Option One took retaliatory action against plaintiff and her account by denying her application for a loan modification because she filed suit against it.

117.    This action constitutes "an unfavorable change in the terms of an account that does not affect all or a substantial portion of a class of the creditor's accounts." 12 C.F.R. §

202.2 (c)(1)(ii).

118.    A direct causal connection exists between plaintiff's filing of this action and Option One's subsequent denial of her application for a loan modification.

119.    As a result of Option One's retaliatory conduct, plaintiff has suffered actual damage and is entitled to recover actual damages as well as statutory damages, punitive damages, equitable and declaratory relief, costs and attorney fees.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against Option One for:

a.    Actual and statutory and punitive damages according to proof;

b     Reasonable attorneys' fees and costs;

c.    Injunctive relief, if retaliatory action has not creased or does not cease immediately; and

d.    Such other and further relief the court deems proper and just.

Respectfully submitted,

s/Al Hofeld, Jr.
Al Hofeld, Jr.

Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
and The Social Justice Project,
208 S. LaSalle Street, Suite #1650
Chicago, Illinois 60604
Phone - (312) 345-1004
Fax - (312) 346-3242
al@alhofeldlaw.com

22

## JURY DEMAND

Plaintiff demands trial by jury.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

## NOTICE OF LIEN

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.


s/Al Hofeld, Jr.
Al Hofeld, Jr.


Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
and The Project for Social Justice, Inc.
208 S. LaSalle Street, Suite #1650
Chicago, Illinois 60604
Phone - (312) 345-1004
Fax – (312) 346-3242
al@alhofeldlaw.com

24

1

# APPENDIX A

# EXHIBIT A

Prepared by:

PRIME INVESTMENT MORTGAGE CORP
2240 W. ARMITAGE
CHICAGO, IL 60647

Loan Number:  041067123
Servicing Number:  001654687-1

439601      [Space Above This Line For Recording Data]

# MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on     April 28, 2005    . The mortgagor is
PATRICIA JONES ALSO KNOWN AS PATRICIA SMITH AND MARK SMITH

("Borrower").

This Security Instrument is given to
     PRIME INVESTMENT MORTGAGE, AN ILLINOIS BROKER
which is organized and existing under the laws of    ILLINOIS    , and whose
address is   2240 W. ARMITAGE, CHICAGO, IL 60647     ("Lender").
Borrower owes Lender the principal sum of
     ONE HUNDRED NINTY EIGHT THOUSAND SEVEN HUNDRED FIFTY
     .AND NO/100THs    Dollars (U.S. $198,750.00   ).
This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for monthly
payments, with the full debt, if not paid earlier, due and payable on    May 01, 2035   . This
Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals,
extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect
the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security
Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described
property located in      Cook      County, Illinois:

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART THEREOF.

Permanent Real Estate Index Number: 19-24-206-020

which has the address of      6357 S CAMPBELL AVE, CHICAGO      [Street, City],
Illinois     60629-1217    ("Property Address");
    [Zip Code]

ILLINOIS-Single Family
Page 1 of 8

ILD10011 (05-28-98)

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. **Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard for property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. Section 2601 *et seq.* ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

3. **Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this

Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

    **5. Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

    All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

    Unless Lender and Borrower otherwise agree in writing, or applicable Law otherwise requires, insurance proceeds shall be applied first to reimburse Lender for costs and expenses incurred in connection with obtaining any such insurance proceeds, and then, at Lender's option, in such order and proportion as Lender may determine in its sole and absolute discretion, and regardless of any impairment of security or lack thereof: (i) to the sums secured by this Security Instrument, whether or not then due, and to such components thereof as Lender may determine in its sole and absolute discretion; and/or (ii) to Borrower to pay the costs and expenses of necessary repairs or restoration of the Property to a condition satisfactory to Lender. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, Lender may collect the insurance proceeds. Lender may, in its sole and absolute discretion, and regardless of any impairment of security or lack thereof, use the proceeds to repair or restore the Property or to pay the sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

    Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

    If Borrower obtains earthquake insurance, any other hazard insurance, or any other insurance on the Property and such insurance is not specifically required by Lender, then such insurance shall (i) name Lender as loss payee thereunder, and (ii) be subject to the provisions of this paragraph 5.

    **6. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower acknowledges that the Lender does not desire to make a loan to Borrower secured by this property on the terms contained in the Note unless the property is to be occupied by Borrower as Borrower's primary/secondary residence. Lender makes non-owner residence loans of different terms. Borrower promises and assures Lender that Borrower intends to occupy this property as Borrower's primary/secondary residence  and that Borrower will so occupy this property as its sole primary/secondary residence within sixty (60) days after the date of the Security Instrument. If Borrower breaches this promise to occupy the property as Borrower's primary/secondary residence, then Lender may invoke any of the following remedies, in addition to the remedies provided in the Security Instrument; (1) Declare all sums secured by the Security Instrument due and payable and foreclose the Security Instrument, (2) Decrease the term of the loan and adjust the monthly payments under the Note accordingly, increase the interest rate and adjust the monthly payments under the Note accordingly, or (3) require that the principal balance be reduced to a percentage of either the original purchase price or the appraised value then being offered on non-owner occupied loans.

    Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

    Borrower shall, at Borrower's own expense, appear in and defend any action or proceeding purporting to affect the Property or any portion thereof or Borrower's title thereto, the validity or priority of the lien created by this Security Instrument, or the rights

or powers of Lender with respect to this Security Instrument or the Property. All causes of action of Borrower, whether accrued before or after the date of this Security Instrument, for damage or injury to the Property or any part thereof, or in connection with any transaction financed in whole or in part by the proceeds of the Note or any other note secured by this Security Instrument, by Lender, or in connection with or affecting the Property or any part thereof, including causes of action arising in tort or contract and causes of action for fraud or concealment of a material fact, are, at Lender's option, assigned to Lender, and the proceeds thereof shall be paid directly to Lender who, after deducting therefrom all its expenses, including reasonable attorneys' fees, may apply such proceeds to the sums secured by this Security Instrument or to any deficiency under this Security Instrument or may release any monies so received by it or any part thereof, as Lender may elect. Lender may, at its option, appear in and prosecute in its own name any action or proceeding to enforce any such cause of action and may make any compromise or settlement thereof. Borrower agrees to execute such further assignments and any other instruments as from time to time may be necessary to effectuate the foregoing provisions and as Lender shall request.

**7. Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate in effect from time to time and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

**8. Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

**9. Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

**10. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Lender may apply, use or release the condemnation proceeds in the same manner as provided in paragraph 5 hereof with respect to insurance proceeds.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph

ILD10014 (05-28-98)

17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**13. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

**14. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**15. Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**16. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

**19. Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law. The holder of the Note and this Security Instrument shall be deemed to be the Lender hereunder.

**20. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any

governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

Borrower shall be solely responsible for, shall indemnify, defend and hold harmless Lender, its directors, officers, employees, attorneys, agents, and their respective successors and assigns, from and against any and all claims, demands, causes of action, loss, damage, cost (including actual attorneys' fees and court costs and costs of any required or necessary repair, cleanup or detoxification of the Property and the preparation and implementation of any closure, abatement, containment, remedial or other required plan), expenses and liability directly or indirectly arising out of or attributable to (a) the use, generation, storage, release, threatened release, discharge, disposal, abatement or presence of Hazardous Substances on, under or about the Property, (b) the transport to or from the Property of any Hazardous Substances, (c) the violation of any Hazardous Substances law, and (d) any Hazardous Substances claims.

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

ADDITIONAL COVENANTS. Borrower and Lender further covenant and agree as follows:

**21. Acceleration; Remedies.** If any installment under the Note or notes secured hereby is not paid when due, or if Borrower should be in default under any provision of this Security Instrument, or if Borrower is in default under any other mortgage or other instrument secured by the Property, all sums secured by this Security Instrument and accrued interest thereon shall at once become due and payable at the option of Lender without prior notice, except as otherwise required by applicable law, and regardless of any prior forbearance. In such event, Lender, at its option, and subject to applicable law, may then or thereafter invoke the power of sale and/or any other remedies or take any other actions permitted by applicable law. Lender will collect all expenses incurred in pursuing the remedies described in this Paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**22. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for releasing the Property for services rendered if the charging of the fee is permitted under applicable law.

**23. Waiver of Homestead.** Borrower waives all right of homestead exemption in the Property.

**24. Misrepresentation and Nondisclosure.** Borrower has made certain written representations and disclosures in order to induce Lender to make file loan evidenced by the Note or notes which this Security Instrument secures, and in the event that Borrower has made any material misrepresentation or failed to disclose any material fact, Lender, at its option and without prior notice or demand, shall have the right to declare the indebtedness secured by this Security Instrument, irrespective of the maturity date specified in the Note or notes secured by this Security Instrument, immediately due and payable.

**25. Time is of the Essence.** Time is of the essence in the performance of each provision of this Security Instrument.

**26. Waiver of Statute of Limitations.** The pleading of the statute of limitations as a defense to enforcement of this Security Instrument, or any and all obligations referred to herein or secured hereby, is hereby waived to the fullest extent permitted by applicable law.

**27. Modification.** This Security Instrument may be modified or amended only by an agreement in writing signed by Borrower and Lender.

**28. Reimbursement.** To the extent permitted by applicable law, Borrower shall reimburse Trustee and Lender for any and all costs, fees and expenses which either may incur, expend or sustain in the execution of the trust created hereunder or in the performance of any act required or permitted hereunder or by law or in equity or otherwise arising out of or in connection with this Security Instrument, the Note, any other note secured by this Security Instrument or any other instrument executed by Borrower in connection with the Note or Security Instrument. To the extent permitted by applicable law, Borrower shall pay to Trustee and Lender their fees in connection with Trustee and Lender including, but not limited to assumption application fees; fees for payoff demands and, statements of loan balance; fees for making, transmitting and transporting copies of loan documents, verifications, full or partial lien releases and other documents requested by borrower or necessary for performance of Lender's rights or duties under this Security Instrument; fees arising from a returned or dishonored check; fees to determine whether the Property is occupied, protected, maintained or insured or related purposes; appraisal fees, inspection fees, legal fees, broker fees, insurance mid-term substitutions, repair expenses, foreclosure fees and costs arising from foreclosure of the Property and protection of the security for this Security Instrument; and all other fees and costs of a similar nature not otherwise prohibited by law.

**29. Clerical Error.** In the event Lender at any time discovers that the Note, any other note secured by this Security Instrument, the Security Instrument, or any other document or instrument executed in connection with the Security Instrument, Note or notes contains an error that was caused by a clerical mistake, calculation error, computer malfunction, printing error or similar error, Borrower agrees, upon notice from Lender, to re-execute any documents that are necessary to correct any such error(s). Borrower further agrees that Lender will not be liable to Borrower for any damages incurred by Borrower that are directly or indirectly caused by any such error.

**30. Lost, Stolen, Destroyed or Mutilated Security Instrument and Other Documents.** In the event of the loss, theft or destruction of the Note, any other note secured by this Security Instrument, the Security Instrument or any other documents or instruments executed in connection with the Security Instrument, Note or notes (collectively, the "Loan Documents"), upon Borrower's receipt of an indemnification executed in favor of Borrower by Lender, or, in the event of the mutilation of any of the Loan Documents, upon Lender's surrender to Borrower of the mutilated Loan Document, Borrower shall execute and deliver to Lender a Loan Document in form and content identical to, and to serve as a replacement of, the lost, stolen, destroyed, or mutilated Loan Documents, and may be treated for all purposes as the original copy of such Loan Document.

**31. Assignment of Rents.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property. Borrower shall have the right to collect and retain the rents of the Property as they become due and payable provided Lender has not exercised its rights to require immediate payment in full of the sums secured by this Security Instrument and Borrower has not abandoned the Property.

**32. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.
[Check applicable box(es)]

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [X] 1-4 Family Rider |
| [ ] No Prepayment Penalty Option Rider | [ ] Planned Unit Development Rider | [ ] Occupancy Rider |
| [ ] Other(s) (specify) | | [ ] |

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.
Witnesses:

_____     _____
                                                                                                        (Seal)                                                                                         (Seal)
                                                                                                     -Borrower                                                                                    -Borrower

_Patricia Smith_____     _____
                                                                                                        (Seal)                                                                                         (Seal)
PATRICIA    SMITH                                              -Borrower                                                                                    -Borrower

_Mark Smith_____     _____
                                                                                                        (Seal)                                                                                         (Seal)
MARK    SMITH                                                      -Borrower                                                                                    -Borrower

_____     _____
                                                                                                        (Seal)                                                                                         (Seal)
                                                                                                     -Borrower                                                                                    -Borrower

ILD10017 (05-28-98)

STATE OF ILLINOIS,                                         County ss: *Cook*

I, *the undersigned*                        , a Notary Public in and for said county and state do hereby certify that

*PATRICIA JONES*
*MARK SMITH*        , personally known to me to be the same person(s) whose name(s) subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that *they* signed and delivered the said instrument as *their* free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and official seal, this *28* day of *APRIL 2005*        ,

My Commission Expires: *8-1-07*

*Carla Wojtasik*
Notary Public

```
"OFFICIAL SEAL"
Carla Wojtasik
Notary Public, State of Illinois
My Commission Exp. 08/01/2007
```

ILD10018 (05-28-98)

Loan Number:  041067123      Servicing Number:  001654687-1      Date:  04/28/05

# ADJUSTABLE RATE RIDER
## (LIBOR Index - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made  April 28, 2005                              ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
PRIME INVESTMENT MORTGAGE, AN ILLINOIS BROKER
(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

6357  S CAMPBELL AVE,   CHICAGO, IL 60629-1217

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**The Note** provides for an initial interest rate of          8.200%                  . The Note provides for changes in the interest rate and the monthly payments, as follows:

**4.      INTEREST RATE AND MONTHLY PAYMENT CHANGES**
      **(A) Change Dates**
      The interest rate I will pay may change on the first day of   May 01        2007           , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."
      **(B) The Index**
      Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."
      If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.
      **(C) Calculation of Changes**
      Before each Change Date, the Note Holder will calculate my new interest rate by adding
      SIX AND 225/1000                     percentage point(s) ( 6.225%    )
to the Current Index. The Note Holder will then round the result of this addition to the next higher one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will

MULTISTATE ADJUSTABLE RATE RIDER-LIBOR INDEX – **Single Family**
Page 1 of 3                                                                                                              USRI0021 (02-23-99)

Loan Number:  041067123      Servicing Number:  001654687-1      Date:  04/28/05

be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 11.200% or less than 8.200% . Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1.0%) from the rate of interest I have been paying for the preceding six months. In no event will my interest rate be greater than 14.200% or less than 8.200% .

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

### TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Covenant 17 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Loan Number:  041067123        Servicing Number:  001654687-1        Date:  04/28/05

     BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)          _____ (Seal)
PATRICIA  SMITH                                MARK  SMITH

_____ (Seal)          _____ (Seal)

_____ (Seal)          _____ (Seal)

**MULTISTATE ADJUSTABLE RATE RIDER-LIBOR INDEX-Single Family**
Page 3 of 3                                                     USRI0023 (02-23-99)

Loan Number: 041067123      Servicing Number: 001654687-1      Date: 04/28/05

## 1-4 FAMILY RIDER
## Assignment of Rents

THIS 1-4 FAMILY RIDER is made   April 28, 2005          , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to

PRIME INVESTMENT MORTGAGE, AN ILLINOIS BROKER

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

6357  S CAMPBELL AVE,  CHICAGO, IL 60629-1217

(Property Address)

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.     ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in the Security Instrument, the following items are added to the Property description, and shall also constitute the Property covered by the Security Instrument: Building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, panelling and attached floor coverings now or hereafter attached to the Property, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B.     USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C.     SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D.     RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Covenant 5.

**E.     "BORROWER'S RIGHT TO REINSTATE" DELETED.** Covenant 18 is deleted.

**F.     BORROWER'S OCCUPANCY.** Unless lender and Borrower otherwise agree in writing, the first paragraph in Covenant 6 concerning Borrower's occupancy of the property is deleted. All remaining

MULTISTATE 1-4 FAMILY RIDER
Page 1 of 3                                                              USR1001.wp (11-19-04)

Loan Number: 041067123      Servicing Number: 001654687-1      Date: 04/28/05

Covenants and agreements set forth in Covenant 6 shall remain in effect.

**G.    ASSIGNMENT OF LEASES.** Upon Lender's request, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph F, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H.    ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has  given Borrower notice of its intention to receive Rents after a default by borrower under the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of its intention to receive Rents to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Covenant 7.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not and will not perform any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This Assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I.    "ASSIGNMENT OF RENTS" MODIFIED.** Any Covenant of the Security Instrument granting an Assignment of Rents to Lender is superseded by this Rider.

**J.    CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

MULTISTATE 1-4 FAMILY RIDER

USR1001.wp (11-19-04)

Loan Number: 041067123        Servicing Number:  001654687-1        Date:  04/28/05

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_Patricia Smith_ _____                    _____
PATRICIA   SMITH                    Borrower                                        Borrower

_Mark Smith_ _____                         _____
MARK   SMITH                        Borrower                                        Borrower


_____                    _____
                                    Borrower                                        Borrower


**MULTISTATE 1-4 FAMILY RIDER**
Page 3 of 3                                                              USR1001.wp (11-19-04)

# EXHIBIT B

## ADJUSTABLE RATE NOTE
### (LIBOR Index - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

6357  S CAMPBELL AVE,  CHICAGO, IL 60629-1217
[Property Address]

**1.    BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S.    $198,750.00            (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is
PRIME INVESTMENT MORTGAGE,  AN ILLINOIS  BROKER
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.    INTEREST**

Interest will be charged on unpaid principal until the full amount of principal has been paid.  Interest will be calculated on the basis of a 12-month year and a 30-day month.  I will pay interest at a yearly rate of    8.200%         . The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.    PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making payments every month.

I will make my monthly payments on the first day of each month beginning on  June 01        ,  2005    .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on,
May 01        ,  2035     , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at    PRIME INVESTMENT MORTGAGE CORP
2240 W. ARMITAGE, CHICAGO, IL  60647
or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S.    $1,486.16     . This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**(D) Application of Payments**

Payments received by the Note Holder will be applied in the following order: (i) prepayment charges due under this Note; (ii) amounts payable under paragraph 2 of the Security Instrument (defined below); (iii) interest due under this Note; (iv) principal due under this Note; and (v) late charges due under this Note.

**4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the first day of    May              ,  2007       ,
and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding
SIX AND 225/1000                        percentage point(s) ( 6.225%      )
to the Current Index. The Note Holder will then round the result of this addition to the next higher one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than    11.200%    or less than   8.200%    . Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1.0%) from the rate of interest I have been paying for the preceding six months. In no event will my interest rate be greater than    14.200%    or less than    8.200%    .

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.      BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount on the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.      LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

**7.      BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of    15    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.000%   of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default. If I am in default, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all interest that I owe on that amount, together with any other charges that I owe under this Note or the Security Instrument, except as otherwise required by applicable law.

**(C) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(D) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.      HAZARD OR PROPERTY INSURANCE**

Unless I provide Note Holder with evidence of the insurance coverage required by my agreement with Note Holder, Note Holder may purchase insurance at my expense to protect Note Holder's interest in my collateral. This insurance may, but need not, protect my interests. The coverage that Note Holder purchases may not pay any claim that I make or any claim that is made against me in connection with collateral. I may later cancel any insurance purchased by Note Holder, but only after providing Note Holder with evidence that I have obtained insurance as required by our agreement. If Note Holder purchases insurance for the collateral, I will be responsible for the costs of that insurance, including interest and any other charges Note Holder my impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance.  The costs of the insurance may be added to my total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance I may be able to obtain on my own.

**9.      GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**10.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**11.    WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**12.    SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.


_____ (Seal)      _____ (Seal)
PATRICIA   SMITH           -Borrower                                     -Borrower


_____ (Seal)      _____ (Seal)
MARK   SMITH              -Borrower                                     -Borrower


_____ (Seal)      _____ (Seal)
                                 -Borrower                                     -Borrower


[Sign Original Only]

# EXHIBIT C

## A. U.S. Department of Housing and Urban Development

| B. Type of Loan | | |
|---|---|---|
| 1. [ ] FHA | 2. [ ] FmHA | 3. [ x ] Conv. Unins. |
| 4. [ ] VA | 5. [ ] Conv. Ins. | [ ] Other. |
| 6. File Number | | 7. Loan Number |
| 429601 | | 041067123 |
| 8. Mortgage Ins. Case No. | | |

## Settlement Statement

| | |
|---|---|
| C. Note: | This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked ("POC") were paid outside the closing: they are shown here for information purposes and are not included in the totals. |
| D. Name of Borrower: | Patricia Jones a/k/a Patricia Smith<br>Mark Smith |
| E. Name of Seller: | |
| F. Name of Lender: | Prime Investment Mortgage, 2240 W. Armitage, Chicago, IL 60647 |
| G. Property Location: | 6357 South Campbell, Chicago, IL 60629 |
| H. Settlement Agent: | Stewart Title of Illinois                              TIN:    36-2849696 |
| Place of Settlement: | 9913 Southwest Highway Oak Lawn IL 60453 |
| I. Settlement Date: | 4/28/2005                    Proration Date:      5/3/2005 |

| 100. | Gross amount due from borrower: | | 400. | Gross amount due to seller: | |
|---|---|---|---|---|---|
| 101. | Contract sales price | | 401. | Contract sales price | |
| 102. | Personal property | | 402. | Personal property | |
| 103. | Settlement charges to borrower (line 1400) | 51,667.57 | 403. | | |
| 104. | MTG. PAYOFF SELECT PORTFOLIO | 145,552.03 | 404. | | |
| 105. | | | 405. | | |
| 106. | City/town taxes | | 406. | City/town taxes | |
| 107. | County taxes | | 407. | County taxes | |
| 108. | Assessments | | 408. | Assessments | |
| 109. | | | 409. | | |
| 110. | | | 410. | | |
| 111. | | | 411. | | |
| 112. | | | 412. | | |
| 120. | Gross amount due from borrower: | 197,219.60 | 420. | Gross amount due to seller: | 0.00 |
| 201. | Deposit or earnest money | | 501. | Excess deposit (see instructions) | |
| 202. | Principal amount of new loan(s) | 198,750.00 | 502. | Settlement charges to seller (line 1400) | 0.00 |
| 203. | Existing loan(s) taken subject to | | 503. | Existing loan(s) taken subject to | |
| 204. | | | 504. | Payoff of first mortgage loan | |
| 205. | | | 505. | Payoff of second mortgage loan | |
| 206. | | | 506. | | |
| 207. | | | 507. | | |
| 208. | | | 508. | | |
| 209. | | | 509. | | |
| 210. | City/town taxes | | 510. | City/town taxes | |
| 211. | County taxes | | 511. | County taxes | |
| 212. | Assessments | | 512. | Assessments | |
| 213. | | | 513. | | |
| 214. | | | 514. | | |
| 215. | | | 515. | | |
| 216. | | | 516. | | |
| 217. | | | 517. | | |
| 218. | | | 518. | | |
| 219. | | | 519. | | |
| 220. | Total paid by/for borrower: | 198,750.00 | 520. | Total reduction in amount due seller: | 0.00 |
| 301. | Gross amount due from borrower (line 120) | 197,219.60 | 601. | Gross amount due to seller (line 420) | 0.00 |
| 302. | Less amount paid by/for borrower (line 220) | 198,750.00 | 602. | Less total reduction in amount due seller(line 520) | 0.00 |
| 303. | CASH ( )FROM (X)TO BORROWER | 1,530.40 | 603. | CASH ( )FROM ( )TO SELLER | 0.00 |

SUBSTITUTE FORM 1099 SELLER STATEMENT - The information contained in Blocks E, G, H and I and on line 401 (or, if line 401 is asterisked, lines 403 and 404), 406, 407 and 408-412 (applicable part of buyer's real estate tax reportable to the IRS) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

SELLER INSTRUCTION - If this real estate was your principle residence, file form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of form 4797, Form 8252 and/or Schedule D (Form 1040).

You are required by law to provide Stewart Title of Illinois with your correct taxpayer identification number.

If you do not provide Stewart Title of Illinois with your correct taxpayer identification number, you may be subject to civil or criminal penalties.

| 700. | Total sales/broker commission | | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|---|
| | Division of commission (line 700) as follows: | | | | |
| 701. | $ | | | | |
| 702. | $ | | | | |
| 703. | Commission paid at settlement | | | | |
| 704. | | | | | |
| | | | | | |
| 801. | Loan origination fee | to | Prime Investment Mortgage | 3,468.00 | |
| 802. | Loan discount | | | | |
| 803. | Appraisal fee | to | Grace Appraisal Services | 600.00 | |
| 804. | Credit report | to | Prime Investment Mortgage | 16.63 | |
| 805. | Lender's inspection fee | | | | |
| 806. | Mortgage insurance application fee | | | | |
| 807. | Assumption fee | | | | |
| 808. | Processing Fee | to | Prime Investment Mortgage | 250.00 | |
| 809. | Application Fee | to | Prime Investment Mortgage | 850.00 | |
| 810. | Tax Service Fee | to | Prime Investment Mortgage | 65.00 | |
| 811. | Underwritting Fee | to | Prime Investment Mortgage | 800.00 | |
| 812. | | | | | |
| 813. | | | | | |
| 814. | | | | | |
| 815. | | | | | |
| | | | | | |
| 901. | Interest from | | | | |
| 902. | Mortgage insurance premium for | | | | |
| 903. | Hazard insurance premium for | | to State Farm | 1,072.36 | |
| 904. | Interest from 5/03/2005 to 5/01/2005 | | to Prime Investment Mor | (90.54) | |
| 905. | | | | | |
| | | | | | |
| 1001. | Hazard insurance | 6 mo.@ $134.6700 per mo. | | 808.02 | |
| 1002. | Mortgage insurance | | | | |
| 1003. | City property taxes | | | | |
| 1004. | County property taxes | 4 mo.@ $171.3400 per mo. | | 685.36 | |
| 1005. | Annual assessments (maint.) | | | | |
| 1006. | | | | | |
| 1007. | Aggregate Adjustment | to . | | (269.34) | |
| 1008. | | | | | |
| 1009. | | | | | |
| | | | | | |
| 1101. | Settlement or closing fee | to | Stewart Title of Illinois | 225.00 | |
| 1102. | Abstract or title search | | | | |
| 1103. | Title examination | | | | |
| 1104. | Title insurance binder | | | | |
| 1105. | Document preparation | | | | |
| 1106. | Notary fees | | | | |
| 1107. | Attorney's fees to | | | | |
| | includes above items no.: | | | | |
| 1108. | Title insurance | to | Estate Title Group, LLC | 715.00 | |
| | includes above items no.: | | | | |
| 1109. | Lender's coverage | $199,500.00 | $715.00 | | |
| 1110. | Owner's coverage | | | | |
| 1111. | Loc Note/Comp/EPA Endorsemen to | Estate Title Group, LLC | | 200.00 | |
| 1112. | ARM Endorsement | to | Estate Title Group, LLC | 100.00 | |
| 1113. | Stat Policy | to | Stewart Title of Illinois | 3.00 | |
| 1114. | PO/PKG Processing Fee | to | Stewart Title of Illinois | 35.00 | |
| 1115. | Commitment Update Fee | to | Estate Title Group, LLC | 50.00 | |
| 1116. | 24 Month Chain of Title | to | Stewart Title of Illinois | 150.00 | |
| 1117. | | | | | |
| | | | | | |
| 1201. | Recording fees: | Deed $28.00  Mortgage $54.00 | | 82.00 | |
| 1202. | City/county tax/stamps: | | | | |
| 1203. | State tax/stamps: | | | | |
| 1204. | | | | | |
| 1205. | | | | | |
| 1206. | | | | | |
| 1207. | | | | | |
| 1208. | | | | | |
| | | | | | |
| 1301. | Survey | | | | |
| 1302. | Pest inspection | | | | |
| 1303. | EST. OF RED. HOLDBACK | to | Stewart Title of Illinois | 1,000.00 | |
| 1304. | EST. OF REDEMPTION SOLD 20 to | DAVID D. ORR | | 6,923.08 | |
| 1305. | Pay on Account | to | Nuvell Credit | 28,627.00 | |
| 1306. | Pay on Account | to | BNEFHCL/HFC | 3,040.00 | |
| 1307. | Pay on Account | to | GR AM FIN | 2,262.00 | |
| 1400. | Total settlement charges (entered on lines 103, section J and 502, section K) | | | 51,667.57 | |

CERTIFICATION: I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all recei

*Patricia Jones a/k/a Patricia Smith*

*Mark Smith*

Patricia Jones a/k/a Patricia Smith

Mark Smith

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

_____     4/28/05

Stewart Title of Illinois                                              Date

**SELLER'S AND/OR PURCHASER'S STATEMENT** Seller's and Purchaser's signature hereon acknowledges his/their approval of tax prorations and signifies their understanding that prorations were based on taxes for the preceding year, or estimates for the current year, and in the event of any change for the current year, all necessary adjustments must be made between Seller and Purchaser; likewise any default in delinquent taxes will be reimbursed to Title Company by the Seller.

Title Company, in its capacity as Escrow Agent, is and has been authorized to deposit all funds it receives in this transaction in any financial institution, whether affiliated or not. Such financial institution may provide Title Company computer accounting and audit services directly or through a separate entity which, if affiliated with Title Company, may charge the financial institution reasonable and proper compensation therefore and retain any profits therefrom. Any escrow fees paid by any party involved in this transaction shall only be for checkwriting and input to the computers, but not for aforesaid accounting and audit services. Title Company shall not be liable for any interest or other charges on the earnest money and shall be under no duty to invest or reinvest funds held by it at any time. Sellers and Purchasers hereby acknowledge and consent to the deposit of the escrow money in financial institutions with which Title Company has or may have other banking relationships and further consent to the retention by Title Company and/or its affiliates of any and all benefits (including advantageous interest rates on loans) Title Company and/or its affiliates may receive from such financial institutions by reason of their maintenance of said escrow accounts.

The parties have read the above sentences, recognize that the recitations herein are material, agree to same, and recognize Title Company is relying on the same.

Purchasers/Borrowers                                              Sellers

*Patricia Jones a/k/a Patricia Smith*

Patricia Jones a/k/a Patricia Smith

Mark Smith

**WARNING:** It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18: U.S. Code Section 1001 and Section 1010.

# EXHIBIT D

Loan Number: 041067123                    Servicing Number:
# FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
## (REAL ESTATE)
Provisions proceeded by a box (☐), are applicable only if the box is marked.

☐ PRELIMINARY    ☒ FINAL

LENDER (Creditor):  PRIME INVESTMENT MORTGAGE
2240 W. ARMITAGE
CHICAGO, IL 60647

Borrower(s) Name(s):  PATRICIA SMITH
MARK SMITH

Address: 6357 S CAMPBELL AVE
CHICAGO, IL 60629-1217

Loan Type: CONVENTIONAL
Loan Program: 631

Property Address: 6357 S CAMPBELL AVE
CHICAGO, IL 60629-1217

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | AMOUNT FINANCED | TOTAL OF PAYMENTS |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 9.768 % | $413,879.58 | $192,957.54 | $606,837.12 |

**YOUR PAYMENT SCHEDULE WILL BE:**

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE |
|---|---|---|
| 24 payments of $1,486.16 monthly, beginning Jun 01, 2005 | | |
| 335 payments of $1,699.91 monthly, beginning Jun 01, 2007 | | |
| 1 payment of $1,699.43 on May 01, 2035 | | |

**VARIABLE RATE:**

☒  This transaction is subject to a Variable-Rate Feature.  Disclosures about Variable-Rate Feature have been provided to you earlier.

The current index used for this calculation is _3.414%_ .

**SECURITY:**
You are giving a security interest in the Property located at: 6357 S CAMPBELL AVE
CHICAGO, IL 60629-1217
**LATE CHARGE:**
If you are more than  FIFTEEN  days late in making any payment, you will pay a late charge of
☐ the lesser of  ☐ the greater of  ☒ an amount equal to  ☐ $_____  ☐ 5.000 %
of the overdue payment of principal and interest.
**INSURANCE:**
You may obtain property insurance from anyone you want that is acceptable to Lender.
**FILING/RECORDING FEE:**
☒ $ 85.00 _____
**PREPAYMENT:**
If you pay off early, you
☐ may  ☒ will not  have to pay a fee.
☐ may  ☒ will not  be entitled to a refund of part of the finance charge.
**ASSUMPTION:**
Someone buying your home,
☐ cannot assume the remainder of the mortgage on the original terms.
☒ may, subject to conditions, be allowed to assume the remainder of the mortgage on the original terms.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, prepayment refunds and penalties, and creditor's policy regarding assumption of the obligation.
"e" means estimate

☐ Please refer to the "Good Faith Estimate" for an Itemization of Amount Financed.    ☒ Please refer to the Itemization of Amount Financed Statement.

I/We have received and read a copy of this disclosure and the documents referred to in this disclosure.

_Patricia Smith_   4-28-05
Borrower  PATRICIA SMITH     Date

Borrower                     Date

_Mark Smith_   4-28-05
Borrower  MARK SMITH     Date

Borrower                     Date

Borrower                     Date

Borrower                     Date

Page 1 of 1                                 USD0301.wp (12-16-04)

# EXHIBIT E

Property Address:    6357 S CAMPBELL AVE
                     CHICAGO, IL  60629-1217

---

**YOUR RIGHT TO CANCEL**

You are entering into a transaction that will result in a mortgage, lien, or security interest on/in your home.  You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

(1) the date of the transaction, which is    04/28/2005    ; (i.e., the date you signed your loan documents) or
(2) the date you received your Truth in Lending disclosures; or
(3) the date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien, or security interest is also canceled.  Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien, or security interest on/in your home has been canceled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property.  If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**HOW TO CANCEL:**

If you decide to cancel this transaction, you may do so by notifying us in writing,

Name of Creditor    PRIME INVESTMENT MORTGAGE

at          2240 W. ARMITAGE
            CHICAGO, IL  60647

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below.  Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of    05/02/2005    (or midnight of the third business day following the latest of three events listed above).  If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

| _____ | _____ |
| Date | Consumer's Signature |

ON THE DATE LISTED ABOVE I/WE THE UNDERSIGNED EACH RECEIVED TWO (2) COMPLETED COPIES OF THE NOTICE OF RIGHT TO CANCEL IN THE FORM PRESCRIBED BY LAW ADVISING ME/US OF MY/OUR RIGHT TO CANCEL THIS TRANSACTION.

---

| Applicant  PATRICIA SMITH | Date | Co-Applicant MARK SMITH | Date |
| *Patricia Smith* | 4-28-05 | *Mark Smith* | 4-28-05 |
| Applicant | Date | Co-Applicant | Date |
| | | | |
| Applicant | Date | Co-Applicant | Date |

# NOTICE OF RIGHT TO CANCEL

Transaction I.D. No.:                                      Loan Number: 8002635687-1
Borrowers: PATRICIA  SMITH and MARK  SMITH

Property Address:    6357  S CAMPBELL AVE
                     CHICAGO, IL  60629-1217

---

**YOUR RIGHT TO CANCEL**

You are entering into a transaction that will result in a mortgage, lien, or security interest on/in your home.  You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

(1) the date of the transaction, which is   04/28/2005          ; (i.e., the date you signed your loan documents) or
(2) the date you received your Truth in Lending disclosures; or
(3) the date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien, or security interest is also canceled.  Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien, or security interest on/in your home has been canceled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property.  If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**HOW TO CANCEL:**

If you decide to cancel this transaction, you may do so by notifying us in writing,

Name of Creditor    PRIME INVESTMENT MORTGAGE

at          2240 W.  ARMITAGE
            CHICAGO, IL  60647

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below.  Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of   05/02/2005    (or midnight of the third business day following the latest of three events listed above).  If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

<strong>I WISH TO CANCEL</strong>

_____                    _____
            Date                                         Consumer's Signature

ON THE DATE LISTED ABOVE I/WE THE UNDERSIGNED EACH RECEIVED TWO (2) COMPLETED COPIES OF THE NOTICE OF RIGHT TO CANCEL IN THE FORM PRESCRIBED BY LAW ADVISING ME/US OF MY/OUR RIGHT TO CANCEL THIS TRANSACTION.

_____  4-28-05          _____  4-28-05
Applicant  PATRICIA  SMITH      Date       Co-Applicant MARK  SMITH      Date

_____                    _____
Applicant                       Date       Co-Applicant                 Date

_____                    _____
Applicant                       Date       Co-Applicant                 Date

Page 1 of 1                                                    USD0011.wp (02-07-03)

# EXHIBIT F

**NOTICE OF ASSIGNMENT, SALE OR TRANSFER OF SERVICING RIGHTS**

PATRICIA  SMITH and MARK  SMITH
6357  S CAMPBELL AVE,
CHICAGO, IL 60629-1217

Date: April 28, 2005

RE: Transfer/Sale of Loan

Dear: PATRICIA  SMITH and MARK  SMITH                    Loan Number: 041057123

You are hereby notified that the servicing of your mortgage loan, that is, the right to collect payments from you, is being assigned, sold or transferred from __PRIME INVESTMENT MORTGAGE__ to____ __Option One Mortgage Corporation__ _____ effective with your payment due _____.

The assignment, sale or transfer of the servicing of the mortgage loan does not affect any term or condition of the mortgage instruments, other than terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your present servicer send you this notice at least 15 days before the effective date of transfer, or at closing. Your new servicer must also send you this notice no later than 15 days after this effective date or at closing.

Your present servicer is____ __PRIME INVESTMENT MORTGAGE__ _____.If you have any questions relating to the transfer of servicing from your present servicer call customer service at____ __(773) 645-3400__ _____. This is a toll-free or collect call number.

Your new servicer will be_____ __Option One Mortgage Corporation__ _____

The business address for your new servicer is: __3 Ada, Irvine, CA  92618__ _____.

The toll-free telephone number of your new servicer is _____.

If you have any questions relating to the transfer of servicing to your new servicer call__Customer__ ____ __Service__ ___ at__800-648-9605__ between___7:30___ a.m. and_____6:00_____ p.m. on the following days ____ __Monday thru Friday__ _____.

The date that your present servicer will stop accepting payments from you is __06/01/05__ ____. Send all payments due on or after that date to your new servicer.

You should also be aware of the following information, which is set out in more detail in Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. 2605):

During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due-date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

Section 6 of RESPA (12 U.S.C. 2605) gives you certain consumer rights. If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgment within 20 Business Days of receipt of your request. A"qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for the request.

Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account, and must provide you with a written clarification regarding any dispute. During this 60-Business Day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent the servicer from initiating foreclosure if proper grounds exist under the mortgage documents.

A Business Day is a day on which the offices of the business entity are open to the public for carrying on substantially all of its business functions.

Section 6 RESPA also provide for damages and cost for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section. You should seek legal advice if you believe your rights have been violated.

Sincerely Yours,

PRIME INVESTMENT MORTGAGE

✱___P.S___                           ✱___MS___
    Borrower's Initials

Page 1 of 1                                              USD5201.wp (12-27-02)

# EXHIBIT G

# Account Information

**OPTION ONE**
M O R T G A G E

|  |  |
|---|---|
| Statement Date | 02/19/2008 |
| Payment Due Date | 10/01/07 |
| Loan Number | 0016546871 |

| Item Description | Amount |
|---|---|
| Principal Balance | $195,081.85 |
| Escrow Balance | $ .00 |
| Unpaid Late Charges | $1,710.54 |
| Interest Rate | 11.200% |

PATRICIA SMITH
MARK SMITH
6357 S CAMPBELL AVE
CHICAGO IL 60629-1217

040345/FL    RC LB

| Payment Elements | |
|---|---|
| Principal & Interest | $1,933.49 |
| Escrow | $340.00 |
| Optional Products | $ .00 |
| Other | $ .00 |
| Total Payment | $2,273.49 |

| Year To Date | |
|---|---|
| Interest | $ .00 |
| Taxes | $1,117.02 |

Customer Contact Center: 800.648.9605
Home Retention: 888.275.2648
Online: www.optiononeonline.com

| Property Address: | 6357 S CAMPBELL AVE |
|---|---|
| | CHICAGO IL 60629 |
| Home Phone: | 773-476-6821 |
| Other Phone: | 773-434-3088 |

Please be advised any outstanding fees and/or advances will be satisfied prior to principal.

## Activity Since Last Statement

| Date | Description | Principal | Interest | Escrow | Misc. | Late/Other Charges | Total |
|---|---|---|---|---|---|---|---|
| 02/07 | FCL STAT EXP COUNTY TAX DISB | DUE: 02/08 | | $1,117.02- | | | |
| 02/19 | LATE CHG ASSMT | | | | | $96.67- | |

*Payments received after the statement date may not appear on this statement.*

### Pay By Phone

Option One puts the power of choice in your hands when making a payment! We offer the use of our interactive self-service application, EZ Pay, and also offer you the choice of a phone pay with one of our associates. As of 12/01/06 the charge for either of these services is shown below.

| *0-6 days past due date | Free |
|---|---|
| 7-15 days past due date | $10.00 |
| 16+ days past due date | $15.00 |

*Regardless of weekend and/or Holiday

**Payments can also be made online at www.optiononeonline.com.**

**Automatic Payment Drafting:** If you would like to have your payment automatically drafted from your checking or savings account, please call our Customer Contact Center at 800.648.9605.

---

Please include this portion with your payment. No partial payments accepted. Please do not send cash. Thank you for your business. If you are paying by personal check, please see the "Notice of Possible Electronic Check Conversion" section on the reverse of the statement.

Statement Date: 02/19/08
PATRICIA SMITH
MARK SMITH
Loan Number: 0016546871

To change address and phone number, check here and complete back of form.

Make checks payable to:

OPTION ONE PAYMENT PROCESSING
PO BOX 44042
JACKSONVILLE FL 32231-4042

| | |
|---|---|
| Payment Due Date | 10/01/07* |
| Current Payment | $2,273.49 |
| Past Due Payment(s) | $11,492.48 |
| Unpaid Late Charges | $1,710.54 |
| Other Charges | $25.00 |
| Optional Products | $ .00 |
| **Total Amount Due** | **$15,501.51** |
| After 03/16/08 Add Late Charge Of | $96.67 |
| Total Payment After 03/16/08 | $15,598.18 |

| Additional Principal | $ |
|---|---|
| Future Mortgage Payments | $ |
| **Total Remitted** | **$** |

0016546871 0227349 0237016 001550151 015598189

p.4        3242 396 312:oT        TSS48TT37TT        ;morF 34:21 8002-40-RAM

# EXHIBIT H

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ☐ the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse will not be used as a basis for loan qualification, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ VA  ☑ Conventional  ☐ Other (explain): | Agency Case Number | Lender Case Number |
|---|---|---|---|
| | ☐ FHA  ☐ USDA/Rural Housing Service | | |

| Amount | Interest Rate | No. of Months | Amortization Type: |
|---|---|---|---|
| $ 198,750 | 8.200 % | 360/360 | ☐ Fixed Rate  ☐ Other (explain): ☐ GPM  ☑ ARM (type): 2/28 no prepay penalty |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state) ZIP) | No. of Units |
|---|---|
| 6357 S. CAMPBELL,  Chicago, IL 60629   County: Cook | 2 |

| Legal Description of Subject Property (attach description if necessary) | Year Built |
|---|---|
| | |

| Purpose of Loan | ☐ Purchase  ☐ Construction  ☐ Other (explain): | Property will be: |
|---|---|---|
| | ☑ Refinance  ☐ Construction-Permanent | ☑ Primary Residence  ☐ Secondary Residence  ☐ Investment |

*Complete this line if construction-permanent loan.*

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a+b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

*Complete this line if this is a refinance loan.*

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements ☑ made ☐ to be made |
|---|---|---|---|---|
| 1995 | $ 67,000 | 138,000 | Cash-Out/Debt Consolidation | Cost: $ |

| Title will be held in what Name(s) | Manner in which Title will be held | Estate will be held in: |
|---|---|---|
| PATRICIA JONES SMITH  MARK SMITH | Joint tenants | ☑ Fee Simple  ☐ Leasehold (show expiration date) |

| Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain) |
|---|
| Equity from Subject Property |

## III. BORROWER INFORMATION

| | Borrower | Co-Borrower |
|---|---|---|
| Name (include Jr. or Sr. if applicable) | PATRICIA JONES SMITH | MARK SMITH |
| Social Security Number | 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 | 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 |
| Home Phone (incl. area code) | 773-476-6821 | 773-476-6821 |
| DOB (MM/DD/YYYY) | 11/22/1966 | 12/03/1961 |
| Yrs. School | 12 | 12 |
| Marital Status | ☑ Married  ☐ Unmarried (include single, divorced, widowed)  ☐ Separated | ☑ Married  ☐ Unmarried (include single, divorced, widowed)  ☐ Separated |
| Dependents (not listed by Co-Borrower) | no. 0   ages | no. 0   ages |
| Present Address (street, city, state, ZIP) | ☑ Own ☐ Rent  10  No. Yrs.  6357 S. CAMPBELL  Chicago, IL 60629 | ☑ Own ☐ Rent  10  No. Yrs.  6357 S.CAMPBELL  Chicago, IL 60629 |
| Mailing Address, if different from Present Address | | |

*If residing at present address for less than two years, complete the following:*

| Former Address (street, city, state, ZIP) | ☐ Own ☐ Rent ___ No. Yrs. | Former Address (street, city, state, ZIP) | ☐ Own ☐ Rent ___ No. Yrs. |
|---|---|---|---|

## IV. EMPLOYMENT INFORMATION

| | Borrower | Co-Borrower |
|---|---|---|
| Name & Address of Employer | state subsidized child care  6357 s. campbell  Chicago, IL 60629 | |
| Self Employed | ☐ | ☐ |
| Yrs. on this job | | |
| Yrs. employed in this line of work/profession | 8 | |
| Position/Title/Type of Business | self employed | |
| Business Phone (incl. area code) | | |

*If employed in current position for less than two years or if currently employed in more than one position, complete the following:*

| | Borrower | Co-Borrower |
|---|---|---|
| Name & Address of Employer | ☐ Self Employed  Dates (from-to) | ☐ Self Employed  Dates (from-to) |
| | Monthly Income $ | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Business Phone (incl. area code) |
| Name & Address of Employer | ☐ Self Employed  Dates (from-to) | ☐ Self Employed  Dates (from-to) |
| | Monthly Income $ | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Business Phone (incl. area code) |

Freddie Mac Form 65  01/04
Calyx Form 1003 Loanapp1.frm 01/04

Page 1 of 4

Borrower  M S
Co-Borrower  P.J.S

Fannie Mae Form 1003  0'

**Schedule of Real Estate Owned** (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 6357 S. CAMPBELL Chicago, IL 60629 | SFR | $ 265,000 | $ 138,000 | $ 0 | $ 1,365 | $ 305 | $ 0 |
| Totals | | $ 265,000 | $ 138,000 | | $ 1,365 | $ 305 | |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|

## VII. DETAILS OF TRANSACTION

| | |
|---|---|
| a. Purchase price | $ |
| b. Alterations, improvements, repairs | |
| c. Land (if acquired separately) | |
| d. Refinance (incl. debts to be paid off) | 179,481.00 |
| e. Estimated prepaid items | 1,154.85 |
| f. Estimated closing costs | 14,460.71 |
| g. PMI, MIP, Funding Fee | |
| h. Discount (if Borrower will pay) | |
| i. Total costs (add items a through h) | 195,096.56 |
| j. Subordinate financing | |
| k. Borrower's closing costs paid by Seller | |
| l. Other Credits (explain) | |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 198,750.00 |
| n. PMI, MIP, Funding Fee financed | |
| o. Loan amount (add m & n) | 198,750.00 |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | -3,653.44 |

## VIII. DECLARATIONS

If you answer "yes" to any questions a through i, please use continuation sheet for explanation.

| | Borrower Yes | Borrower No | Co-Borrower Yes | Co-Borrower No |
|---|---|---|---|---|
| a. Are there any outstanding judgments against you? | ☐ | ☑ | ☐ | ☑ |
| b. Have you been declared bankrupt within the past 7 years? | ☐ | ☑ | ☐ | ☑ |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | ☐ | ☑ | ☐ | ☑ |
| d. Are you a party to a lawsuit? | ☐ | ☑ | ☐ | ☑ |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | ☐ | ☑ | ☐ | ☑ |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | ☐ | ☑ | ☐ | ☑ |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | ☐ | ☑ | ☐ | ☑ |
| h. Is any part of the down payment borrowed? | ☐ | ☑ | ☐ | ☑ |
| i. Are you a co-maker or endorser on a note? | ☐ | ☑ | ☐ | ☑ |
| j. Are you a U.S. citizen? | ☑ | ☐ | ☑ | ☐ |
| k. Are you a permanent resident alien? | ☐ | ☑ | ☐ | ☑ |
| l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | ☑ | ☐ | ☑ | ☐ |
| m. Have you had an ownership interest in a property in the last three years? | ☑ | ☐ | ☑ | ☐ |
| (1) What type of property did you own-principal residence (PR), second home (SH), or investment property (IP)? | PR | | PR | |
| (2) How did you hold title to the home-solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | SP | | SP | |

## IX. ACKNOWLEDGEMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of the information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described herein; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated herein; (6) any owner or servicer of the Loan may verify or reverify any information contained in the application from any source named in this application, and Lender, its successors or assigns may retain the original and/or an electronic record of this application, even if the Loan is not approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the owner or servicer of the Loan may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer credit reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X _Mary Smith_ | 4/28-05 | X _Latricia Smith_ | 4-28-05 |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a Lender may discriminate neither on the basis of this information, nor on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation or surname. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | ☐ I do not wish to furnish this information | CO-BORROWER | ☐ I do not wish to furnish this information |
|---|---|---|---|
| Ethnicity: | ☐ Hispanic or Latino ☑ Not Hispanic or Latino | Ethnicity: | ☐ Hispanic or Latino ☑ Not Hispanic or Latino |
| Race: | ☐ American Indian or Alaska Native ☐ Asian ☑ Black or African American ☐ Native Hawaiian or Other Pacific Islander ☐ White | Race: | ☐ American Indian or Alaska Native ☐ Asian ☑ Black or African American ☐ Native Hawaiian or Other Pacific Islander ☐ White |
| Sex: | ☑ Female ☐ Male | Sex: | ☑ Female ☐ Male |

| To be Completed by Interviewer This application was taken by: ☑ Face-to-face interview ☐ Mail ☐ Telephone ☐ Internet | Interviewer's Name (print or type) Laura Dantuma | Name and Address of Interviewer's Employer Prime Investment Mortgage 2240 West Armitage Ave Chicago, IL 60647 (P) 773-645-3400 (F) 866-466-6438 |
|---|---|---|
| | Interviewer's Signature | Date |
| | Interviewer's Phone Number (incl. area code) 773-645-3400 | |

Freddie Mac Form 65    01/04
Calyx Form 1003 Loanapp3.frm   01/04

Fannie Mae Form 1003    01/04